2016-23 from Minnesota at Abrahim Fofana v. Alejandro Mayorkas Ms. Mueller Good morning, Your Honor. May it please the Court, Ruth Ann Mueller on behalf of the United States Citizenship and Immigration Services. Your Honor, issue preclusion cannot apply in this case due to the substantial and intervening change of law under the Patriot Act. Further, Fofana's solicitation of funds to Ulimo, a Tier 3 terrorist organization, was not actually litigated by the immigration judge. Your Honor, I should reverse the District Court's decision, and I respectfully request two minutes of rebuttal time. Your Honor, when it comes to the first issue on appeal, there was a substantial intervening change of law between Fofana's asylum adjudication and the I-485 denial. We know from the Herrera case that when there is a substantial and intervening change of law, issue preclusion cannot apply. Your Honor, collectively, the amendments to the Patriot Act and the Real ID Act did twofold. One, they created a substantially new tiered designation for determining terrorist organizations. Prior to the Patriot Act, and this is the standard that was used at Fofana's asylum adjudication, there was only one definition for a terrorist organization. And that is what we now know as a Tier 1 terrorist organization, where the Department of State and the Secretary of State determines that it's a terrorist organization. Now we have this three-tiered organization. We have the Tier 1 organization that was the foreign terrorist organization pre-Patriot Act. We have Tier 2, which are other designated organizations by the Secretary of State and the Attorney General. We have here Tier 3, a group of two individuals, but they're organized. I understand that one, but clarify for me the substantial change with respect to terrorist activity unrelated to a terrorist organization. Yes, Your Honor. So as you mentioned, the second major substantial change that happened here was the change that in order for an individual to provide solicitation of funds to a Tier 3 terrorist organization, there does not need to be this nexus to terrorist activity. So in this law prior to 2001, there needed to be a nexus. Solicitation of funds was a subsection under what is now considered the material support bar post-Real ID Act. So engaging the terrorist activity— On the latter point, because the Real ID Act was not referenced in the Fifth Circuit decision. So with respect to this second change as to nexus, to what extent was it made in the Patriot Act versus the Real ID Act? Well, Your Honor, in the Patriot Act—to answer your question, I have two problems. Under the Patriot Act, solicitation of funds was moved out of the material support bar and was created a separate subsection under engaging terrorist activity. So post-Patriot Act, we have the material support bar providing material support for a Tier 3 terrorist organization and solicitation of funds separately providing funds to a Tier 3 terrorist organization that did not require this analysis of material support. In the Fifth Circuit's decision, Your Honor, that you're referring to in the AMROLA, that is distinguishable here because in AMROLA there was a discussion of material support. And in that case, the question— I understand that, but the Fifth Circuit did not discuss the Real ID Act, and I have trouble parsing from the briefs the change, the specific change with respect to this nexus requirement that the Real ID added to what the Patriot Act had done. Under the Real ID Act, so under the Real ID Act, you have the two separate prongs, material support and solicitation of funds. The Real ID Act clarified that you can provide solicitation of funds to a Tier 3 terrorist organization, that definition having been defined in the Patriot Act. So it further clarified what solicitation of funds means. And what's the statutory site to that Real ID Act provision? It would be 1182A3B4, Your Honor. Well, yeah, but that's not a Real ID Act section. I'm not going to be able to tell what the Real ID Act just from reading the codification, am I? Or is that a brand new provision? That is the new provision under 1182. So the difference being in the original is under A3B3. Here we're looking at A3B4. Can you give me a section from the Real ID Act in the statutes at large? Just give me, you know, Section 43 or whatever it was. I know it's a complicated statute. Your Honor, I do not have the specific section in front of me for this. Thank you. We'll dig it out. Thank you, Your Honor. I have a question on this point. Do you have any authority that says under the old statute that soliciting funds for a terrorist organization to use for, I think you have the examples of food and medical supplies in your brief, would not have counted as engaging in terrorist activity under the old statute? Under the old statute, Your Honor, I do not have a specific case. But again, we're discussing solicitation of funds separately from material support. And there's many cases under these terrorist grounds. Yes, Your Honor. Well, the old statute said, you know, that engaging in terrorist activity meant to afford material support, etc. And then it said including soliciting funds for any terrorist organization. And I understand your theory to be that that did not include all soliciting funds for terrorist organizations because I think you're saying some soliciting of funds for a terrorist organization did not amount to material support. The other argument against that is that the statute specified that soliciting of funds for any terrorist organization was included. And so I'm asking whether there's any authority that would help us see how it was actually applied. Your Honor, the issue of how much material support or how much solicitation of funds would be considered material support is not an issue in this case. The parties are not disputing whether or not there is substantial evidence for USCIS's decision. There are other cases that do that. I'm talking about whether the meaning of the statute changed. You're saying there was an intervening change in law because the current statute is broader in how much solicitation of funds it encompasses. Well, yes, Your Honor. And we know it's broader looking at the Ninth Circuit decision in Cardenas and the District of Minnesota's decision in El Rifaje that solicitation of funds at that time there was only one definition of a terrorist organization. In April of 2001, we only had this one definition of a terrorist organization. Now we have this tiered system that incorporates an entirely new class of individuals that would be under this new tier. So there would be more individuals that would fall under this tier three section. Counselor, let me raise a related problem. The problem I have with this case is that everybody, including the Ninth and Fifth Circuits, seem to be treating it as a pure question of statutory interpretation. You know, right out of Scalia and Gardner, so to speak. To me, it's a question of how did the agency interpret and apply and enforce the respective provisions? Is there anything you can cite to that would confirm what's implicit in your argument is that the agency wouldn't have made this charge under the old law? As kind of an administrative law junkie, it seems to me that's the underlying fundamental issue here. But nobody addresses it. Again, the change in law between the Patriot Act and the ID Act, it created these new amendments that have substantial effect. And Congress intended for them to be— I won't say that, but where is the immigration judge manual provision that said to all of them that these are fundamental changes and that it's a new ballgame that would be relevant to this preclusion argument? Well, Your Honor— If the agency was applying the old law as the alien argues in this case, then the alien should win. But if the agency was not applying the old law as broadly as what they say you should read it as a matter of statutory interpretation, then it seems to me preclusion looks a lot less appropriate. Well, yes, Your Honor. Issue preclusion cannot apply where the immigration judge or the government attorney at the time could not, or even the law could have brought up this line of questioning. This line of questioning solicitation of funds to a Tier 3 terrorist organization did not exist. But there's a difference between could not have done it and didn't do it. Yes, Your Honor. And all we are hearing about is, well, if you look at the statute, it could not have been done or it could have been done. And that's, you know, that's just lawyers and judges looking at questions of statutory interpretation. This is a much more practical issue. And the question, Your Honor, what could have happened back in April 2001? What did happen? Was the agency bringing any claims of this kind before the Patriot Act? Your Honor, I generally cannot speculate on what happened in all the cases prior to the Patriot Act. But in this case, terrorism-related and emission-related grounds were not brought up at all, nor could they have been brought up. But the question of what could have been brought up at the time of... Well, the IJ arguably brought it up, and the government in the Fifth Circuit, whether you call it hinting or not, did bring it up in cross-examination. So it was not exactly an unknown issue. Again, Your Honor, this refers to claim preclusion versus issue preclusion. The idea that the issue was not actively litigated under issue preclusion. But that's not the case for claim preclusion. And the parties have not briefed the issue of whether claim preclusion would apply here, Your Honor, nor am I aware of any case where claim preclusion has applied in these matters. So the question of what could have been brought up falls outside the scope of the briefing. But again, what could have been brought up, the issue of solicitation of funds to a Tier 3 terrorist organization, could not have been brought up. Why not? Why not? Why wouldn't that have been any terrorist organization? Well, Your Honor, at the time we had foreign terrorist organization, and that was the definition under the statute of terrorist organization. We're aware that there was a definition of a foreign terrorist organization. But we're also aware that the statute referred to, quote, any terrorist organization. You know, that's what the district court relied on. And so the question is, why couldn't a Tier 3 organization under current law have been any terrorist organization under former law? Yes, Your Honor. In looking at Congress's use of the term foreign terrorist organization versus terrorist organization, those terms have been used interchangeably since the INA in 1990. Congress used that term interchangeably in the amendments in the 1996 statutory changes. I mean, we look at the Reynolds case to determine that these, you know, reasonable statutory construction tactics that we use, they are not invariable. If the legislative history speaks the contrary, we can look at Congress's intent there. And I realize, Your Honor, I have about 10 seconds before I reserve rebuttal time, but we are able to understand Congress's intent in looking at the legislative history in the 1996 amendments and their use of the terms, and looking at the congressional record in the October 25th, 2001 floor debate between Congress, where Congress specifically said we do not have a definition for these new terrorist organizations. We do not have a way to protect international security and immigration laws of organized terrorist threats, per se. Respectfully, Your Honor, I'll reserve my time unless Your Honor has additional questions. Thank you. Mr. Wilson? Good morning, Your Honor. May it please the Court, I'm David Wilson. I'm here on behalf of Mr. Fofana. I don't think, I don't, is your camera off? No, no. Can you not see me? I cannot see you. I can't. And I do. I can stare into the eyes of Judge Benton for the rest of the hearing, I guess.  All right. Well, thank you, Your Honor. As I was saying, I've represented Mr. Fofana since 2001. So I'm very familiar with this case and all the trials and tribulations that have come along with it over the years. The government, in making their statutory argument, is essentially trying to shade the law. Their brief has many statements that are outright troubling at moments. There's a statement that the immigration judge, for example, in 2001, did not have the authority to actually determine what any terrorist organization was. And that they were locked into what an FTO is under Section 1189. And that the problem is the law as evolved is not represented cleanly in the government's argument. 1990, any terrorist organization was added in relation to soliciting funds as engaging in terrorist activity. Do you have any record of agency proceedings or immigration judge manuals or anything else that would tell us that it was applied to cover what are now Tier 3 terrorist organizations? And not only what were designated as foreign terrorist organizations? So I had scoured Westlaw in an attempt to try to find that one. And I saw a statement to the government's brief, and I was looking to see if there was agency support. I couldn't find anything that confined any terrorist organization from being in the purview of the immigration judge. I found one board case that touched upon the older version of the statute as it related to excludability, because that's what it would have been prior to ADEPA and IRA. And in relation to that, they're talking about it, but they're not really struggling with any terrorist organization. And then in the midst of the case, the law started shifting while the case was still pending. So the question gets lost. And unfortunately, there is no resolution of it. And so, I mean, unfortunately, just the byproduct of how long this case has gone on and the age of the Internet, I couldn't find anything that predated this, that squarely confined what immigration judges could find in relation to defining any terrorist organization. How about on solicitation of funds? Did you find anything that showed whether the statute changed the scope of that one? No. And I don't know that there's been any debate as to what soliciting funds has meant either. I think that that's been kind of given a standard definition. No, the next is required. Yeah. There's clearly been material support or not. Well, so I think that's the difference between the act of soliciting has not been challenged. But the law, as it relates to what is the intention in relation to the soliciting, has changed. So the Real ID Act, your Honor, had asked the question. It's at 109, Public Law 109.13, Section 103B, is where the Judge Loken was asking the question. I found the citation in the interim. That added in the nexus element. The nexus component, though, shifted that the money had to then be just given. What the group ultimately does with the money is irrelevant. That's what the law changes in the nexus. So it broadened the reach of the law in terms of where the money, how the money was used. It didn't change, though, that you had to give the money to a qualifying organization. And in this case, especially on this record, we're still in the narrow vein of giving money specifically to activity that's related to essentially warfare that's going on in Liberia at the time. It's literally right in the center of the lane from the previous version of the definition. The adding on or shift in this nexus doesn't change the substantive laws that applies to this particular individual. There was no doubt where the money was going. He literally testified about it. The change in the knowledge requirement. Because as I read the adjustment decision, the IJ or whoever the adjudicator was ends up saying that your client had met the clear and convincing standard. The clear and convincing standard is actually an exception from the knowledge requirement. So it allowed people to be able to try to establish that they did not know how the money was going to be used. But isn't that a tougher standard than what would have faced the alien under the former law? No, no. That's because he's arguing an exception when arguing that standard. He's actually arguing that because the money was given generally, I couldn't control what the actor did. And I had no way for basically to foresee that the group was going to use the money for terrorist activities. In this case, there was no denying what the group was doing. There was no denying what Mr. Fofana was claiming he was doing, the purpose of giving the money. He was giving the money to support a fight against what was then the ruler of Liberia, Charles Taylor. And as the agency noted in its decision, between 1990 and 1996, the main players in that country were clearly identified. They were known. They cited as it was a given fact. It's not even up for debate. At the time of the merits hearing under the underlying asylum application, those two groups were readily identified. The war had been going on for some time. The issues being litigated, Liberian asylum claims, had been rampant in Minnesota. We're one of the largest groups of Liberians in the country, so we were very familiar with it. And so in this record, you have, as noted in points of the transcript, there was discussions before we went on the record. There was a break for the judge to review the record again, and subsequent inquiry. The application itself put front and center very much what Mr. Fofana's conduct was. He did not in any way mince words. He was raising money. At 18, or approximately 18, he joined a Liberian student organization in Saudi Arabia and sought out donors. Donors to give money to support a particular cause, which the Ulema was affiliated with his tribal group, the Mandingos. So for him, supporting them was just common sense. It's the group that he saw as being persecuted by Charles Taylor. And he responded as an 18-year-old wanting to do his part. And so there was no escaping that. The record develops that. The government attorney was present. The government attorney at the time was an experienced attorney. He had been practicing 20 years longer than I have at that point. And so you have also this additional element in this case that often the Amarillo, Norja, and Jua really discuss. You have 8 U.S.C. 1229-A-B-3. And that is going towards what is the role of the judge in these cases. In applying this doctrine, it's easy to overlook that these are not Article III judges. They have a special role. Their role is to actually examine witnesses. It's to take evidence. It's to actually even possibly put evidence in the record. So they are the trier effect, but in effect, they also represent the government interest at the same time. So it's not as if we have two parties who are standing off against each other and are neutral in between. It's more that you have one-and-a-half parties going against each other in that context. And it's apparent in this record. You have a very inquisitive court. When the court receives an objection, rather than ruling on the objection, often the court will ask its own question just to fill in the blank. So when you have an active judge who's fulfilling his statutory duty and resolving questions as it relates to the standard of law, you have engagement by all parties. The government's argument about actually litigating wants to ignore the context in which these cases occur. There are compact hearings that happen with people who are very invested in the issues, have prepared written documents in advance of it, and often will talk beforehand to identify the issues so the testimony gets to the heart of it right away. And so in this case, the law was very clear at the time that to engage in terrorist activity meant soliciting funds for any terrorist organization or any terrorist activity. There was no doubt that the ulema was engaged in weapon warfare, fighting, and, according to the CIS's own decision, some severe atrocities. So what the ulema was up to was not up for debate. So the sole question at that point was what was Mr. Fofana's role in soliciting funds and whether that triggered the bar or not. The judge himself, stepping in the shoes of the prosecutor at this point, asked the specific questions. Now, it's important when noting when he asked the questions, he had gone off the record for some time, so he asked to review the file. So he was making sure that he was evaluating the whole record before concluding any examination of Mr. Fofana. And he came back and raised an issue himself. He asked specifically about the role of the relatives of Mr. Fofana, whether they had been military leaders, because you can also be guilty by association under the law, and then asked specifically about who did you raise money for. He confirmed Mr. Fofana was aware of who the leader of the ulema was, so he's confirming his credibility as well as just as anything else. And so Janjua, because the government raises it as the linchpin case here, Janjua is substantially quite different. So Janjua has no written statement identifying raising of money. You have no testimony of raising money. In fact, the only way money comes up in Janjua is because it's a donation that the father made to the group, not the individual applicant. The father made it. So he is, in all candor, I think Janjua has actually decided correctly under the government's interpretation of the statute, where you have this element of you didn't know what the money was going to be used for, and then you provided tangential support. And so then the statute may in fact ensnare him. And that would not have necessarily been before the court in Janjua in the first instance. I don't think Janjua is actually terribly off the mark. But Amarola, in contrast, it was front and center. It was front and center. The government, the judge commented on it in response to the government's inquiry. It was brought up in relation to what he was doing. He was providing medicine and pharmaceuticals, and he was doing it for a specific group. It was a key or a cornerstone of the application from the very beginning. And so you have these two cases where there are quite contrasting outcomes, but the record themselves actually very much make the outcome understandable. So our case is, we'll say, somewhere in the middle, but I would say shading much more closer to the Fifth Circuit disposition rather than the Ninth. The Ninth isn't necessarily wrong. I just think that it's the record that's actually driving it. In all the collateral estoppel cases, say, you have to look at the specific record to determine whether the elements have been met. And in this record, it couldn't be any clearer. The government's proposing a standard to impose on immigration law proceedings, especially removal proceedings, where we are going to relegate it to statutory key words that if we have to say the buzzword and to get it in the record somehow, in order to be able to know that there's finality of the issue, even though everyone's talking about the very issue at large. Collateral estoppel is not that rigid. It is a rule of equity in many instances. And so to require such perfection in the record is beyond what the doctrine ever requires. The question is, did the parties have an opportunity to litigate the question? Was the question clearly out in the air? Was it open and obvious to everyone? Counsel, let me ask you a question that bothers me here. It's not really brief because it's not relevant. But what if the organization in question had been not a terrorist organization at the time asylum was granted, but had become a terrorist organization under any of the tiers at the time LPR was applied for? How does your argument apply in that case? Sure. There have been instances, Your Honor, where a group is considered to be acting in well within what human rights laws will respect, but then suddenly turn coarse and go dark. And in those instances, unfortunately, the law is retroactive. And once the group goes that direction, the person is unfortunately prejudiced by what that group does after they've already become an asylee. So the law is clear on that. It's because of retroactivity and this distinction of, I believe it's from the Patriot Act when you're applying for admission, that there's a determination made about a group or a group suddenly changes course and does something that brings it within the confines of the statute. And at that point, any application for adjustment or residency at that point also gets prejudiced. And there's just no getting around it. It's an unfortunate part of the law is that it's sweeping because you could have had valid conduct in relation to what was then a bona fide group doing the right thing, that suddenly the group changes course and that person is then accountable for what the group did, even though they may have been isolated. They could have been apart by 20 years. Even if they don't give any new money, you're saying? Right. So the Patriot Act is extremely powerful in that it's retroactive. And so anything that had been decided before then is not going to be disturbed. But because it's a new application under Section 1159, then it's considered an admission. And at that point, the retroactivity element kicks in. I don't understand. I don't understand this. There's still a knowledge requirement. Well, no, you can still argue the issue. I'm just saying generally is if a group had changed direction, I think it was the question. And so if a group had changed direction, you would then be able to apply for the exception. But generally, the statute would be triggered. And you would then be the person applying this to qualify Flint to an exemption to the knowledge element, Your Honor, that you have to have to then produce a clear and convincing evidence. The hypothetical was that the organization was not a terrorist organization when you gave the money to. So why wouldn't you obviously be able to show that you didn't know that it was a terrorist organization when it wasn't a terrorist organization? Oh, I think that a person should be able to show and should prevail in that application. I'm not agreeing that the person should be barred. But I'm answering. That was your answer. Your answer was it's draconian statute. It's retroactive. And the person would lose. Well, or at least lose would probably be severe. At least the statute would be triggered, Your Honor. That's what I meant to say. At that point, then an analysis of the eligibility would then be have to be undertaken at that point, because the group itself in their activity would have been essentially awaken the statute. Why? Why? Why doesn't that draconian principle apply here? Two reasons. One, Your Honor, is that the activity underneath the in the claim itself was already established. And the group was already known at the time in 2001 when the activity was going on. This isn't a group that rose after the fact or determination about what the character of the group. It was known well before that. That's no different than my hypothetical or Judge Collins. I think I understood your hypothetical being, Your Honor, that after a person becomes an asylee, then if the group changes its character, then it was the same. It was the same group at the time asylum was granted. Yeah, but there's no argument. And the support was known at the time of the LPR. It's the same support. But the group has gone rogue, so to speak. The group had gone rogue way before that, Your Honor. The group had gone rogue by 1996. The application here for asylum was in 2001. What group? The Ulimo had gone rogue before 2001, Your Honor. I understood your hypothetical being that the group had changed after the grant of asylum. That's not the case on this record. The group had already committed its atrocities before the asylum application was granted. So the agency must not have thought that the old law covered what the new law would cover. I don't know what the agency was thinking, Your Honor. I do know what the record establishes in terms of what questions were asked in relation to the activity. And the group was openly known for being what they were at the time. I respectfully say I've exhausted my time. I appreciate the extra few minutes you've given me. Thank you. Thank you. For rebuttal, Ms. Mueller. Thank you, Your Honor. First, Your Honor, when it comes to the lack of knowledge exception that's clarified in the Real ID Act, the parties have not briefed the lack of knowledge exception, and that issue is not on appeal. When it comes to the retroactive hypothetical that Your Honor has brought up, I do refer the Court's attention to the Sixth Circuit's decision and the Ninth Circuit's decisions in Bushnority and Danchavar. There the Court was determining whether an organization from the 1970s could qualify as a tier three terrorist organization. And after the post-Patriot Act, the courts in the Sixth Circuit and the Ninth Circuit determined that they had to retroactively apply these amendments to the Patriot Act and Real ID Act, determining that those organizations would be tier three terrorist organizations. Of course, in this case, there's no dispute that Ulimo is a tier three terrorist organization. Your Honor, the most instructive case for Your Honor's review is the Ninth Circuit's decision in Janjua. Similar to Janjua in this case, Bufana does bring forth his background activities and support for Ulimo in his asylum application before the immigration judge. But these terrorism-related admissibility grounds were not actually litigated. And similar to Janjua, Bufana had to bring forth this background for his asylum application for that burden. But similar to Janjua, Your Honor should determine that the intervening changes of law and the fact that this terrorism issue was not actually litigated would require Your Honors to reverse the district court's decision. And I thank you, Your Honor. Very good. Thank you, counsel. It's a complicated case. It's been well-briefed and argued, and we'll take it under advisement.